**In re Jay D. COUCH, Debtor.**

**T. Wayne MOSTILER, Plaintiff,**

**v.**

**Jay D. COUCH, Defendant.**

**Bankruptcy No. 87–00909–N.**
**Adv. No. 87–0996–NT.**

United States Bankruptcy Court,
E.D. Virginia,
Norfolk Division.

Dec. 6, 1988.

David A. Greer, Norfolk, Va., for creditor/plaintiff.

David H. Adams, Virginia Beach, Va., for debtor/defendant.

## MEMORANDUM OPINION AND ORDER

DOUGLAS O. TICE, Jr., Bankruptcy Judge.

This case is before the Court on the plaintiff's complaint to determine the dischargeability of an alleged indebtedness under Bankruptcy Code Section 523(a)(4) and (a)(6) (11 U.S.C. § 523(a)(4) and (a)(6)).

For reasons stated in this opinion the Court finds that an indebtedness of the debtor to the plaintiff in the amount of $19,823.49 is excepted from discharge pursuant to Code Section 523(a)(4).

## FINDINGS OF FACT

During the years 1983 through 1986 and previously, the debtor was president and major shareholder (80 percent) of Jay D. Couch & Associates, Inc. (Couch Associates), a real estate and property management firm with offices in Norfolk, Virginia. The other shareholders (10 percent each) and officers of the corporation were Richard C. Parker and Walter E. Hoffman, Jr.

As president, debtor was in overall charge of the operations of the company and made decisions concerning use of the corporation's cash and bank accounts. Parker was in charge of property management; Hoffman was involved in commercial and industrial sales and leasing and partnership syndications.

Plaintiff, T. Wayne Mostiler, is the owner of an apartment complex located in Portsmouth, Virginia, known as Madison Village Apartments (Madison Village). He purchased the property in late 1982. Following this purchase plaintiff employed Couch Associates to manage Madison Village which it did during the years 1983 until November 1, 1986, at which time the management of the property was transferred to Bush Realty Corporation.

Under its management of Madison Village, Couch Associates was to do all things necessary or required for the proper rental, management, operation and maintenance of the property; this included collecting rents and paying the expenses of operation. In exchange for its services, Couch Associates was to be paid a management fee. A written agreement stating the specifics of their arrangement was executed by the plaintiff and Couch Associates dated September 24, 1984.

Under similar agreements, Couch Associates managed as many as 140 rental properties for many different owners. Properties managed also included properties owned by the debtor individually and with others and by Couch Associates (the Couch properties).

In its operations Couch Associates maintained two principal bank (checking) accounts:

(1) Escrow Account. This was the corporation's trust or fiduciary account for receipt and disbursement of funds belonging to owners of properties managed. Funds of some Couch properties were also held in this account. Deposits to the escrow account included property rents, owners' investments and other funds received by Couch Associates from or on behalf of its clients; disbursements from this account were for payment of expenses on the properties and distributions to owners. Although separate bank accounts were maintained for some properties, the majority of the company's property management accounts were operated out of escrow. Accounting records maintained by the corporation reflected the various transactions in the escrow account among the different properties and owners.

(2) Corporate Account. This was the corporate operating bank account to which deposits were made of management fees, commissions and other corporate income along with transfers from other accounts. From this account the corporation paid its operating expenses and made other transfers including draws to or for the benefit of the debtor.

Transfers of funds were frequently made from the escrow account to the corporate account and from corporate to escrow. The debtor was the only person authorized to sign checks on these two accounts.

Accounting records maintained by Couch Associates included cash disbursements journal (manual), cash receipts journal (computer and manual) and general ledgers (manual). Subledgers were also maintained for the individual properties managed. Couch Associates bookkeepers prepared monthly summaries known as owners statements for each owner and property managed. These statements, which were prepared from the cash receipts and disbursements journals, reflected all receipts and disbursements for a property during the month along with total receipts and disbursements for year to date. In addition, owners statements generally reflected a cumulative net worth or negative worth of a property's management (escrow) account held by Couch Associates in escrow.

It was a common practice of the debtor during the years 1983 through 1986 to use funds in the Couch Associates escrow account wherever needed in the operation of Couch Associates. This included the frequent transfer of funds from escrow to be used for the debtor personally or for the Couch properties. This was accomplished by transfers from escrow to the corporate operating account and occasionally from escrow directly for the debtor's personal use. Some transfers were made out of escrow for the credit of Couch properties which corporate records reveal to have had negative escrow balances and which were therefore already in debt to the escrow

account. These transfers of cash from escrow resulted in the commingling of property owners' escrow funds with other funds of the corporation or the debtor.

During the years 1983 through 1986 the debtor realized substantial income from his real estate business and investments. He also during these years personally made substantial cash deposits to the escrow and corporate accounts. These deposits were made from his income and from borrowed funds.

Notwithstanding the cash deposits made by the debtor to the corporation's escrow and corporate operating bank accounts the corporation's records do not reflect the crediting of these funds to the deficits in the Couch properties accounts. Rather, the corporate records reveal substantial deficits in several of the accounts of Couch properties. The corporation's records do not reflect whether debtor's deposits of cash to the bank accounts were sufficient to make up the deficits in the various Couch properties accounts.

In late 1985 and again in 1986 meetings were held by the three shareholders of Couch Associates along with the company's accountants and attorneys with respect to debtor's practice of using the property owners' escrow funds for purposes other than that lawfully permitted under an escrow. The company's legal counsel advised debtor to return funds which he had caused to be improperly transferred from escrow. There is no evidence as to which specific accounts were the subject of these meetings, nor is there any evidence that the debtor complied with the advice of counsel.

Plaintiff's Madison Village was located in a marginal residential area and was in run down condition. Because of the upkeep costs and cash flow losses suffered by the property, plaintiff was required to make substantial periodic investment in the property by payments of cash to Couch Associates. He also withdrew funds from the property account. The total amounts invested and withdrawn during Couch Associates' management were as follows:

Mostiler Cash Investment Contributions

| | |
|---|---|
| 1983 | $ 33,660.00 |
| 1984 | $ 40,000.00 |
| 1985 | $ 15,000.00 |
| 1986 | $ 28,642.00 |
| Total | $117,302.00 |

Mostiler Cash Withdrawals

| | |
|---|---|
| 1983 | $ 7,550.00 |
| 1985 | $ 1,121.00 |
| 1986 | $ 32,000.00 |
| Total | $ 40,671.00 |

The Couch Associates financial records reveal there should have been a positive cash balance in its escrow account for plaintiff's property account on October 31, 1986, when management of this property was transferred to Bush Realty Corporation. This book balance due plaintiff is calculated as follows:

| | | |
|---|---|---|
| Account Balance per December 31, 1986, trial balance for Madison Village. | | $96,306.00[1] |
| Deduct: | | |
| Posting error | $75,000.00 | |
| Credit for taxes paid by Couch Associates | 2,618.00 | −77,618.00 |
| Corrected account balance, December 31, 1986. | | $18,688.00[2] |

The account balance of $18,688.00 has not been paid and is an indebtedness of Couch Associates and the debtor to the plaintiff.

Couch Associates paid itself monthly management fees during the year 1986 out of Madison Village funds in the total amount of $15,042.00.[3] The payment of

---

1. This figure was taken from Plaintiff's Exhibit No. 51.

2. Although the management of the property was transferred effective November 1, 1986, accounting adjustments were subsequently made to the account which should be reflected in the ending balance. Even though dated December 31, 1986, the trial balance does not reflect transactions involving Bush Realty's management between November 1 and December 31, 1986.

3. The plaintiff asserts that this figure was $18,091.00 which amount is based upon the testimony of Joel Flax of Goodman & Company and the compilation of Goodman & Company (Plaintiff's Exhibit 50). The Court is unable to reconcile this figure with the amount of management fee shown in Plaintiff's Exhibit 51, and no clarification of the discrepancy can be found in the trial transcript. This Court accepts the management fee established by Plaintiff's Exhibit 51.

this expense, which was in accordance with the management agreement, is reflected in the 1986 operating profit for Madison Village.

Upon the transfer of the Madison Village management account to Bush Realty Corporation effective November 1, 1986, Bush Realty Corporation paid the plaintiff the sum of $11,682.00 and also gave him a note in the amount of $4,786.00. The note contains such stringent conditions for payment based upon income to be realized from the property that it is unlikely any note payment will ever be received by the plaintiff. The note is therefore considered worthless.

Following transfer of the property account, plaintiff was required to pay the sum of $1,135.49 for various property or employment tax penalties and interest for Madison Village which were incurred during Couch Associates' management of the property. These charges resulted primarily from late payment of taxes which should have been paid from escrow by Couch Associates but were not paid until the property came under new management.

## DISCUSSION AND CONCLUSIONS OF LAW

Plaintiff asks the Court to determine indebtedness of the debtor excepted from discharge pursuant to Section 523(a)(4) and (a)(6) (11 U.S.C. § 523(a)(4) and (a)(6)). The debtor contests the existence of any indebtedness to plaintiff and also denies the allegations of nondischargeability. Debtor further argues that any indebtedness disclosed by the evidence must be reduced by the amount of $11,642.00, which sum was paid to plaintiff by Bush Realty Corporation in consideration of plaintiff's transferring management of his property account to Bush after October 31, 1986.

The amounts in contention, as claimed in plaintiff's brief, are as follows:

(1) Amount due plaintiff for property account representing escrow account funds received by Couch Associates   $26,653.00
(2) Management fees received by Couch Associates in 1986

*See*, discussion of the reliability of Plaintiff's

from plaintiff's property account   $18,091.00
(3) Tax penalties and interest plaintiff was required to pay as a result of Couch Associates' handling of the property account   $ 1,135.49

Total   $45,879.49

### Couch Associates Escrow Account

The legal issue of dischargeability depends upon whether there is a debt owed by debtor to plaintiff. The first and overriding issue for determination by the Court here is the factual question of whether (and, if so, in what amount) there was a shortage of funds due plaintiff arising from Couch Associates' management of his investment property Madison Village.

Most of the evidence relates to the escrow balance for Madison Village held by Couch Associates. The Court has found that at the termination of the management agreement Madison Village had a positive cash balance in the amount of $18,688.00, a sum which has not been paid to plaintiff due to Couch Associates' insolvency.

A voluminous amount of the corporation's financial books and records was submitted at trial. This data was augmented by testimony of Couch Associates' former head bookkeeper. The Court has concluded that the accounting records, while not complete in all respects, are in general dependable for the purpose of establishing the status of the escrow bank account and plaintiff's property account. In reaching this conclusion the Court relies upon the bookkeeper's demonstrated competency and familiarity with the records as well as testimony of a member of Couch Associates' certified public accounting firm.

In fact, both parties to this proceeding rely on different aspects of the accounting records to establish their opposing positions. Plaintiff contends that the correct approach to establishing a shortage in his property account is by use of the trial balance for the Madison Village account as of December 31, 1986. The trial balance, presented in Plaintiff's Exhibit 51, purports to reflect a summary history of the account for the whole period of Couch Associates'

Exhibit 51 *infra.*

management for the property. This schedule reflects a beginning cumulative balance of cash due the account as of December 31, 1985, a monthly record of 1986 receipts and disbursements and an ending balance due for the account on December 31, 1986. (The account was taken over by a new property management firm on November 1, 1986; however, Exhibit 51 does not account for transactions under this new management.) Thus the trial balance is represented by plaintiff's evidence to take into account all owner's investment and withdrawals and all operating profits or losses for which Couch Associates is responsible to plaintiff in its property management capacity.

Debtor, whose evidence does not seriously undermine Plaintiff's Exhibit 51, argues that the Madison Village account balance should be determined by simply adding the amount of all owner investment and subtracting all owner withdrawals and the net operating losses suffered by the property.

The parties are agreed on one important matter concerning the Madison Village account, that is, a posting error was made in the Couch Associates books which resulted in a $75,000.00 overstatement of the trial balance. In other words, the final account balance shown in the Madison Village trial balance must be reduced by $75,000.00.

Plaintiff contends the amount of the property account due him is $26,653.00, determined as follows:

| | | |
|---|---|---|
| Balance per December 31, 1986, Trial Balance | | $96,305.00 |
| Deduct: | | |
| December 31, 1985 Trial Balance | $58,278.00 | |
| Payroll Credit | $2,618.00 | |
| Owner's Negative Balance at December 31, 1985 | $8,756.00 | |
| Net Balance in account | | $26,653.00 |

Plaintiff attempts in his calculation to reduce the impact of the uncontested $75,-000.00 posting error by applying both the property account balance at December 31, 1985, (Plaintiff's Exhibit 51) and a cumulative negative balance of $8,756.00 reflected on the December 31, 1985, owners statement for Madison Village. In this approach, plaintiff is inconsistent with his reliance upon the accuracy of the trial balance.

As established by Plaintiff's Exhibit 51, there were cumulative net worth amounts in the Madison Village account on December 31, 1985, and December 31, 1986, of $58,278.00 and $96,305.00, respectively. To arrive at the correct net worth or deficit on these dates, the $75,000.00 posting error must be subtracted along with the additional credit in 1986 of $2,618.00 for payroll taxes paid by Couch Associates. Accepting the essential correctness of Plaintiff's Exhibit 51, as the Court does, only these figures are appropriate to arrive at the correct year end account balances for either 1985 or 1986. Evidence at trial indicated that the cumulative balances (below the line) shown on owner's statements are not necessarily reliable. This unreliability is demonstrated by the December 31, 1985, owner's statement reflecting a deficit for Madison Village in the amount of $8,756.00 at the same time the trial balance establishes that the correct deficit was $16,722.00 ($58,278.00 less $75,000.00).

Debtor's argument that plaintiff actually is indebted to Couch Associates is illustrated by the following schedule:

| | |
|---|---|
| Net Loss from Operations | ($ 76,190.44) |
| Owner Withdrawals | ($ 40,670.75) |
| Owner Contributions | $114,801.77 |
| Tax Penalties paid by owner | $ 1,095.64 |
| Bush Payment to owner | ($ 11,980.00) |
| Paid to Mostiler Management | ($ 4,800.00) |
| Payroll Taxes paid by Couch Associates | ($ 2,618.21) |
| Due by Mostiler to Couch and Associates | ($ 22,553.27) |

The Court rejects the debtor's approach to the case because the trial balance method based upon the Couch Associates books and records is more credible and has the support of both Couch Associates former head bookkeeper and its certified public accounting firm. Debtor's computation of net operating losses in at least two instances is understated; the operating statements for 1983 and 1986 include owners investment as income which effectively

gives the plaintiff double credit for investment in these years. On the other side of the ledger, debtor's reducing the account by $4,800.00 for fees paid Mostiler Management (an entity of the plaintiff) results in a double reduction since these payments were charged as expenses and therefore are reflected in the Madison Village operating losses.

### Dischargeability Issues

The Code provisions of Section 523(a) relied upon by plaintiff provide exceptions to discharge of debts:

. . . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny;

. . . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C. § 523(a)(4) and (a)(6) (1982)

The plaintiff has the burden of proof to establish nondischargeability of the debt. *Tilley v. Jessee*, 789 F.2d 1074, 1077 (4th Cir.1986); *Nerco Coal Corp. v. Ball (In re Ball)*, 84 B.R. 410, 414 (Bankr.D.Md.1988). The Court of Appeals for the Fourth Circuit has recently expressed the view that the appropriate standard of proof in dischargeability cases is by a preponderance of the evidence. *Combs v. Richardson*, 838 F.2d 112, 116 (4th Cir.1988). Nevertheless, except where noted in this opinion the evidence upon which this Court bases its determinative findings of fact and conclusions of law satisfies the higher clear and convincing standard of proof.

▪ As a preliminary matter, the Court determines that the debtor is not insulated from the debt and dischargeability issues raised here by virtue of the fact that the transactions in question were done in the name of Jay D. Couch & Associates, Inc. Debtor held 80 percent of the stock of the corporation, was chief executive officer, and, perhaps most importantly, he was in sole control of the corporation's finances and made all decisions concerning use of the company's cash. Moreover, there can be no doubt that both the corporation and the debtor were in a fiduciary relationship to plaintiff in the management of the funds earned by plaintiff's property, Madison Village. *See, United Virginia Bank v. Fussell (In re Fussell)*, 15 B.R. 1016 (W.D.Va. 1981); *Bellity v. Wolfington (In re Wolfington)*, 48 B.R. 920 (Bankr.E.D.Pa.1985); *Dempsey v. Lawrence (In re Lawrence)*, 10 B.R. 853 (Bankr.E.D.Va.1981).

▪ While there is little evidence here to support a finding of fraud by the debtor, the exception to discharge for defalcation by a fiduciary under Section 523(a)(4) is rather broad. Once the fiduciary relationship is established there is no requirement for a showing of intentional wrongdoing. Bankruptcy Judge William A. King, Jr. wrote:

> Defalcation includes the failure of a fiduciary to account for money he received in his fiduciary capacity. It is sufficient if the misrepresentation is due to negligence or ignorance. It is irrelevant that the default by the fiduciary was innocent.

*In re Wolfington*, 48 B.R. at 923.

▪ The evidence in this adversary proceeding clearly establishes that the debtor freely transferred funds from the Couch Associates fiduciary account (escrow) to wherever cash was needed. These transfers included the use of funds by the debtor personally or by the corporation in maintaining its own properties. When this evidence is considered with the corporation's accounting entries which reveal that the plaintiff's property account is due the sum of $18,688.00 from the escrow account for which no funds are available, the Court must conclude the shortage in the account resulted from debtor's improper disbursements from escrow funds. These funds were entrusted to Couch Associates and also to debtor through his absolute control of the corporate funds.

The plaintiff established a prima facie case of defalcation which was not rebutted. Debtor claimed in his testimony that he put in more than enough cash to cover transfers to his property accounts; he also stat-

ed his belief that the plaintiff was actually indebted to Couch Associates based upon the plaintiff's having failed to put up sufficient funds to cover Madison Village cash operating deficits.[4] Although the debtor suggested the corporation's books and records would support his testimony, he failed to develop any such evidence. The Court must accept the specific evidence presented by plaintiff over the general and unsupported assertions of debtor. The debtor's case is considerably undermined by testimony of his former associates in the business concerning the problems caused by Couch Associates' improper use of escrow funds. It is apparent that the firm encountered financial problems which led to its demise and that its use of escrow funds in the control of the debtor resulted in shortages in property accounts, at least in plaintiff's account.

The Court accordingly concludes that the escrow shortage of $18,688.00 resulted from the defalcation of the debtor acting in a fiduciary capacity, and this indebtedness is excepted from discharge pursuant to Section 523(a)(4). *See, In re Wolfington,* 48 B.R. at 920; *In re Lawrence,* 10 B.R. at 853.

More difficult to assess under Section 523(a)(4) is the dischargeability of plaintiff's claims for management fees Couch Associates withdrew and paid itself from plaintiff's funds in 1986 and the tax penalties and interest he had to pay because of Couch Associates' failure to pay taxes accruing under its management. The amounts of these items found by the Court are $15,047.00 in management fees and $1,135.49 in tax penalties and interest.

■ Plaintiff argues that Couch Associates should not profit from its wrongdoing by receiving management fees when it has not performed properly under the management agreement. Plaintiff's position on this, which could have been presented with more precision, seems to be that management fees should not have been paid at a time when the escrow funds were short. Otherwise, the argument could be made for the return of all management fees, not just those paid in 1986.

There is a certain equity to plaintiff's argument. If these fees had not been paid and reduced plaintiff's operating revenues for 1986, the ending balance (and shortage) in the Madison Village property account would have been $33,730.00 ($15,042.00 plus $18,688.00).

The Court might agree with plaintiff's position on this point if the evidence established that the shortage in his escrow funds existed throughout the year 1986.

The evidence demonstrates that at December 31, 1985, plaintiff's property account had a negative balance in escrow of $16,722.00, meaning he was indebted to Couch Associates in that amount because sums expended on behalf of Madison Village exceeded cash investment and revenues to the credit of the property. During 1986 the account went from this negative to a positive balance of $18,688.00. Perhaps a positive situation arose during May 1986 when plaintiff refinanced the property and invested the funds. However, the evidence completely fails to reveal when in 1986 the Couch Associates escrow account did not have funds sufficient to cover plaintiff's positive balance. On this the evidence shows only that the company is insolvent and has not paid plaintiff his balance.

Under these circumstances and since the fees were paid in accordance with the management agreement, the Court must conclude that plaintiff has failed to prove that the management fees should be considered as a part of debtor's defalcation. Accordingly any obligation of debtor to repay these fees to plaintiff is not excepted from discharge under Section 523(a)(4).

■ With respect to the $1,135.49 paid by plaintiff for tax penalties and interest, this item is shown by the evidence to be directly attributable to Couch Associates' failure to pay taxes when there should have been sufficient cash to plaintiff's credit for this purpose. Therefore the Court holds this sum is excepted from dis-

---

4. Implausibly, debtor testified that he considered his situation the same as that of any other property owner whose funds were held in Couch Associates' escrow account.

charge under Section 523(a)(4). *See, In re Lawrence,* 10 B.R. at 853.

■ The Court finds that none of plaintiff's claims should be excepted from discharge under Section 523(a)(6). A finding of willful and malicious injury to property under this section does not require evidence of specific malice since malice may be inferred. However, it must be shown that the debtor acted deliberately and intentionally in disregard of another's property rights. *See, Impulsora Del Territorio Sur, S.A. v. Cecchini,* 780 F.2d 1440 (9th Cir.1985); *St. Paul Fire & Marine Insurance Co. v. Vaughn,* 779 F.2d 1003 (4th Cir.1985); *United Virginia Bank v. Fussell (In re Fussell),* 15 B.R. 1016 (W.D. Va.1981).

■ There is very little evidence in this case to establish that debtor intentionally used plaintiff's cash for improper purposes. There is general evidence that Couch Associates used escrow funds of clients' property accounts for its own purposes, and of course there is evidence that there is no cash to pay the balance in plaintiff's property account. The debtor demonstrated he had made substantial cash deposits to the Couch Associates escrow account and denied that the corporation owed money to plaintiff. The documentary evidence, which proved debtor wrong as to the shortage, is sufficient to support debtor's defalcation as a fiduciary; however, it does not support a finding of willful and malicious conversion of plaintiff's funds.

Finally, the Court must consider the impact of the $11,682.00 payment received by plaintiff from Bush Realty Corporation upon the transfer of management of his property from Couch Associates to Bush. Debtor contends this payment should reduce any indebtedness he may have to plaintiff.

The Court considers that the burden of proof on the effect of this payment is on debtor. Unfortunately, there is very little evidence to assist the Court. The debtor testified that the management was "sold" to Bush though he does not say who was the seller. When asked why the plaintiff received the funds, debtor replied:

Because of shutting down a business and dealing with 30 to 40 projects, we had not received a final accounting, and we wanted to get this project closed, so we allowed Dr. Mostiler to hold these funds until we were able to get the final accounting.

Transcript of Proceedings at 269 (Adv. Pro. No. 87–0996–NT; Second Day). Debtor's testimony also indicates he believed the final accounting would reveal plaintiff owed money to Couch Associates and suggests he expected to be reimbursed from these proceeds. There is little or no suggestion in debtor's testimony or elsewhere that the Bush payment was intended to cover a cash shortage in the Couch Associates escrow account.

A copy of an undated and unsigned management agreement between plaintiff, Couch Associates and Bush Realty was received at trial. It is apparent from this agreement that other documentation which might have shed additional light on the transfer to Bush has not been presented to the Court. There is nothing in the agreement received in evidence which establishes that Bush's payment received by plaintiff was actually a consideration which was intended to flow to Couch Associates. (The management agreement between plaintiff and Couch Associates allowed either party to cancel that agreement upon sixty days notice.)

Given the state of the record on the Bush payment to plaintiff, the Court can only conclude that this payment was received by plaintiff in his own right, and there is no basis to allow it as a credit to debtor or Couch Associates.

In summary, it is the Court's finding that the sum of $19,823.49 ($18,688.00 plus $1,135.49) is owed to plaintiff by debtor, and this sum is excepted from debtor's discharge pursuant to Section 523(a)(4).

IT IS SO ORDERED.